**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| PATRICIA M. ZERFAS, | * | |
| Plaintiff, | * | |
| v. | * | Case No.: PWG-14-2806 |
| SYLVIA BURWELL, Secretary, U.S. | * | |
| Department of Health and Human Services, | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>[1]

Plaintiff has brought this case alleging a hostile work environment caused by sexual harassment in her workplace and retaliation by her employer after she reported the alleged harassment and was suspended from work for two weeks.  Defendant has moved to dismiss or for summary judgment, arguing that even if Plaintiff was harassed, her harasser was not her supervisor and therefore her employer is not liable, and that the suspension had a legitimate, nondiscriminatory justification because the employer had concluded that Plaintiff willingly

---

[1] This Memorandum Opinion addresses: (1) Defendant Sylvia Burwell's Motion to Dismiss or, in the Alternative, for Summary Judgment ("Def.'s Mot."), ECF No. 8, and supporting Memorandum ("Def.'s Mem."), ECF No. 8-1; Plaintiff Patricia M. Zerfas's Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment and Cross Motion for Summary Judgment ("Pl.'s Cross-Mot."), ECF No. 9, and supporting Memorandum (Pl.'s Cross-Mot. Mem.); Defendant's Memorandum in Opposition to Plaintiff's Cross-Motion for Summary Judgment and Reply in Support of Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment ("Def.'s Reply"), ECF No. 10; and Plaintiff's Reply in Support of Plaintiff's Cross Motion for Summary Judgment and Surreply to the Defendant's Reply in Support of Defendant's Motion to Dismiss ("Pl.'s Reply"), ECF No. 12; and (2) Plaintiff's Request for Leave to File Surreply to Defendant's Reply in Support of Defendant's Motion for Summary Judgment ("Pl.'s Mot. to File Surreply"), ECF No. 11.

participated in improper sexual conduct in the workplace.   Plaintiff has cross-moved for summary judgment based on her view that the harasser qualifies as a supervisor because, *inter alia*, he oversaw her day-to-day work and had the ear of management, and that the finding that she participated willingly in sexual conduct was incorrect and therefore cannot be a legitimate justification for her suspension.   I find that whatever degree of supervisory role the harasser filled, he does not fit the narrow definition of a supervisor recognized under current case law and that the employer's justification for Plaintiff's suspension, whether or not it was correct, was arrived at in good faith and was not improper.   Accordingly, I grant Defendant's motion for summary judgment and deny Plaintiff's cross-motion.

## I.   BACKGROUND

In reviewing a motion for summary judgment, the Court considers the facts in the light most favorable to the non-movant, drawing all justifiable inferences in that party's favor.   *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (U.S. 2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004).   Where, as here, the Court is presented with cross-motions for summary judgment, the facts relevant to each motion must be considered in the light most favorable to the nonmovant.   *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).   Unless otherwise stated, this background is composed of undisputed facts.   *See Ricci*, 557 U.S. at 585–86; *George & Co.*, 575 F.3d at 391–92; *Dean*, 336 F. Supp. 2d at 480.[2]

---

[2] Whereas Defendant's exhibits include complete copies of depositions and are clearly tabbed in courtesy copies with Bates numbered pages to provide uniform pagination, most of Plaintiff's exhibits are duplicates of those already provided by Defendant, in many cases excerpted so as to remove all context and lacking clear organization or page numbers.   Accordingly, where possible (and where both parties have relied on the same piece of evidence), I will cite to Defendant's exhibits and included a reference to the "Consolidated Exhibit" page number as "CE____."   In

Plaintiff Patricia M. Zerfas has been employed by the National Institutes of Health ("NIH") as a Biologist in the Pathology Service, Division of Veterinary Resources ("DVR"), Diagnostic and Research Services Branch ("DRSB"), Office of Research Services ("ORS"), Office of the Director, since April 2003. Zerfas ROI Aff. 1, Def.'s Mem. Ex. 9, ECF No. 8-11, CE0651. Dr. Matthew Starost has served as a Research Scientist and Veterinary Pathologist in DVR since July 2002. Starost Aff. 1, Def.'s Mem. Ex. 15, ECF No. 8-17, CE0720. Starost is one of four Veterinary Pathologists in the Pathology Service. Zerfas Decl. ¶ 4, Pl.'s Mem. Ex. 21, ECF No. 9-22 Zerfas's "primary responsibility is to assist the DRSB veterinary pathologists with their diagnostic submissions by providing electron microscopy ("EM") and immunohistochemistry ("IHC") services." Eckhaus Decl. ¶ 6, Def.'s Mem. Ex. 16, ECF No. 8-18, CE0737. Both Zerfas and Starost are subject to the same chain of command: their first-level supervisor is Dr. Michael Eckhaus, their second-level supervisor is Dr. James Crowell, and their third-level supervisor is Dr. Charmaine Foltz. *See* Zerfas ROI Aff. 2, CE0652; Starost Aff. 2, CE0721; Foltz Dep. 10:14 – 11:3, Def.'s Mem. Ex. 6, ECF No. 8-8, CE0329–30.

As described by Zerfas, the intra-office politics in the DRSB are somewhat complex. Because her job is to assist the veterinary pathologists, all of the pathologists have the authority to assign her work, including Starost. Eckhaus Dep. 82:12–15, Def.'s Mem. Ex. 4, ECF No. 8-6, CE0247; Starost Dep. 36:14–17, Def.'s Mem. Ex. 7, ECF No. 8-9, CE0388. In addition to their required tasks, there are regular slide conference and journal club meetings that provide

---

this regard, it bears noting that the factual record before me is particularly robust, inasmuch as Plaintiffs elected to participate in extensive discovery before the NIH Equal Employment Opportunity Office ("EEO Office"), during which voluminous documents were produced, multiple depositions were taken, and motions practice (including for summary judgment) proceeded nearly to a final resolution before the EEO Office. Its culmination was precluded by Plaintiff's decision to withdraw from proceedings before the EEO Office to pursue this litigation. Indeed, given the completeness of the evidentiary record, it is difficult to see how any further discovery would be necessary beyond that already done.

educational and development opportunities for pathologists and other employees interested in attending those meetings; at all relevant times, Starost coordinated these meetings.  Eckhaus Dep. 58:16 – 59:2, CE0223–24.  On many Thursdays, Crowell holds a mandatory staff meeting for all DRSB employees.  Crowell Dep. 31:6 – 33:2, Def.'s Mem. Ex. 5, ECF No. 8-7, CE0305–07.  In 2011, the pathologists also began to hold quarterly lunches with the technicians and support staff.  Eckhaus Nov. Aff. 10, Def.'s Mem. Ex. 25, ECF No. 8-27, CE0941.  And in addition to her job duties, Zerfas also published numerous papers in scholarly journals, frequently co-authoring those articles with Starost.  Zerfas Decl. ¶ 16.

Though Eckhaus was both Zerfas's and Starost's direct supervisor, Zerfas believed that Starost had greater authority than the other pathologists and that he was her supervisor.  Zerfas Dep. Vol. II 429:8–10, Def.'s Mem. Ex. 3, ECF No. 8-5, CE0151.  Starost participated in Zerfas's job interview and recommended that she be hired, Zerfas Decl. ¶ 22, and she states that Starost played a role in selecting summer students to interview and in hiring other individuals, *id.* ¶¶ 23–24.  Starost, along with the other pathologists, sometimes served as "acting chief" when Eckhaus was out of the office, Eckhaus Dep. 84:7–16, CE0249, and he occasionally identified himself as one of the "DRSB Supervisors," Email from Matthew Starost to Patricia Zerfas et al. (Jan. 29, 2010, 8:08 A.M.), Pl.'s Cross-Mot. Mem. Ex. 20, ECF No. 9-21.  There is some evidence to show that Starost provided feedback on her work to Eckhaus, Zerfas Dep. 159:22 – 160:10, CE0040, although Eckhaus denies this, Eckhaus Oct. Aff. 3–4, Def.'s Mem. Ex. 13, ECF No. 8-15, CE0692–93, and there is no dispute that Eckhaus alone was responsible for signing Zerfas's performance appraisals, Zerfas Dep. 178:15–19, CE0045.  In 2006, Starost threatened to have Zerfas removed from a project of his, after which Eckhaus exercised closer supervision of her work.  Zerfas Decl. ¶ 21.  More recently, he went to Eckhaus to request that Zerfas no longer

be permitted to publish papers, although Eckhaus ultimately allowed her to continue doing so. Zerfas Dep. Vol II 431:12 – 432:7, CE0152; Zerfas Decl. ¶ 19, Zerfas also is aware of at least four instances in which negative feedback from Starost led Eckhaus to terminate or relocate other employees.  Zerfas Decl. ¶ 25.

Although the record is sparse with respect to their interactions before early 2010, prior to that point Zerfas and Starost appear to have had a positive working relationship.  When Zerfas took her position in 2003, Starost was setting up an IHC lab in the Pathology Service that Zerfas eventually took over, relying on Starost for support when she encountered difficulties.  Eckhaus Dep. 53:21 – 55:6, CE0218–20.  Beginning in 2006, most of Zerfas's work came from Starost, and his work led to numerous publications.  Zerfas Decl. ¶¶ 10–15.  "The more work [Zerfas] could do for Dr. Starost in publishing, the better were [her] chances of being promoted."  *Id.* ¶ 10.  Starost provided mentoring to Zerfas.  Starost Dep. 19:3–5, CE0371.  According to Starost, he believed that he and Zerfas were friends.  *Id.* at 140:7–19, CE0492.

The majority of the record before me focuses exhaustively on the details of the relationship between Zerfas and Starost for the eleven-month period from June 2010 until May 23, 2011.  For the purposes of the parties' cross-motions for summary judgment it suffices to say that both parties acknowledged that substantial intimate, physical, and sexual contact occurred between Zerfast and Starost during this time period.  While a good deal of the intimate contact between Zerfas and Starost is acknowledged, Plaintiff and Defendant disagree considerably regarding the degree to which Zerfas willingly initiated, or at least participated in, it.  This behavior began in June 2010 when Starost began to touch and put his arm around Zerfas while she was working on the electron microscope. Zerfas ROI Statement 1, Def.'s Mem. Ex. 18, ECF No. 8-20, CE0766; Starost ROI Statement 1, Def.'s Mem. Ex. 18, ECF No. 8-20, CE0775.  Over

time this escalated to massaging her shoulders and waist and frequent hugging.  Zerfas ROI Aff. 7, CE0657; Starost ROI Statement 1, CE0775.   In October 2010, Zerfas exposed her breasts to Starost and he exposed his penis to her, Zerfas ROI Statement 4, CE0769, although this occurred only after Starost had requested to see Zerfas's breasts and asked if she wanted him to expose herself several times, *see* Starost Dep. 47:21 – 48:20, CE0399–400 (indicating that Zerfas declined each request at least once before acceding).   On multiple occasions, Starost touched Zerfas's breasts and Zerfas touched Starost's penis, although Zerfas says that she was forced to participate in this behavior.  Zerfas ROI Statement 4, CE0769.

Starost frequently asked Zerfas to remove her underwear when she was wearing a skirt. *Id.*  In November 2010, Zerfas undressed completely before Starost in the EM lab, but only let him see her back without his glasses.  *Id.*  By December 2010, he began aggressively to request oral sex from Zerfas, which she refused several times.  *Id.* at 5, CE0770.  In early March, either Zerfas or Starost proposed collecting a sample of his semen to view in the electron microscope; Starost wanted Zerfas to masturbate him to collect the sample and, although Zerfas initially refused, she eventually acceded to this request.  *Id.*; Starost ROI Statement 2, CE0776.  At some point Starost pulled down Zerfas's pants and touched her vagina.  Starost Dep. 156:11–20.  Also in the spring of 2011, Zerfas requested Starost to put on a fashion show to show her his Under Armour underwear, Zerfas ROI Statement 6, CE0771, and Starost offered Zerfas a "full body massage," for which Zerfas changed into scrubs but stopped Starost when he tried to massage her breasts, Starost ROI Statement 3, CE0777.  On May 12, 2011, after a 5K walk, Starost proposed that he and Zerfas shower together.  *Id.*  She initially agreed but changed her mind and locked the door to the shower she used so that he could not join her.  Zerfas ROI Statement 6, CE0771.

The parties have introduced contradictory evidence as to the extent to which this relationship was reciprocal and consensual or whether Starost was forcing himself upon Zerfas. Starost claims that he believes that the relationship was consensual, although that conclusion is based partly on his misguided belief that Zerfas was a willing participant because she did not "forcefully tell [him] to stop." Starost ROI Statement 1, CE 0775. And Zerfas does acknowledge that she engaged in some behavior that could have sent mixed signals, such as hugging Starost back, Zerfas ROI Aff. 7, CE0657, asking to see Starost's Under Armour underwear, Zerfas ROI Statement 6, CE0771, buying him beer and taking him to lunch, Zerfas Dep. 201:16 – 205:10, CE0051–52, or slapping and pinching his buttocks as they passed in the hallway, *id.* However, Zerfas is adamant that this behavior was an attempt to make Starost uncomfortable, *id.*, and in any event, she is quite clear that from her perspective, Starost's conduct was unwelcome and caused her significant emotional and physical distress, Zerfas ROI Statement 2–7, CE 0767–71.

On the afternoon of May 23, 2011—eleven months after the conduct that Zerfas now asserts was unwelcome sexual harassment—Zerfas went to Eckhaus and told him that Starost had been harassing her. Eckhaus ROI Aff. 6, Def.'s Mem. Ex. 13, ECF No. 8-15, CE0695. Zerfas said that she did not wish to report the harassment, but rather wanted to keep Eckhaus apprised of the situation because she planned to approach Starost about the harassment and give him a letter demanding that it stop, and she feared that Starost would react badly. *Id.* at 6–7, CE0695–96. She also told Eckhaus that she "felt like [she] consented with [Starost] on some of the behaviors." Zerfas Dep. Vol. II 390:11–19, CE0141. It is undisputed that Eckhaus immediately reported Zerfas's claims to his own supervisor, Crowell, who advised Eckhaus to contact their supervisor, Foltz. Eckhaus ROI Aff. at 7, CE0696. After Eckhaus spoke with Foltz

the next day, the two of them had a telephone call with human resources specialist Lanetta Holloway, who recommended that both Zerfas and Starost be issued cease and desist letters barring them from contact with one another, that Starost's office be relocated, and that an administrative inquiry take place. *Id.* Eckhaus spoke with Zerfas on May 24, as well, and "told her that [he] had a sense that aspects of what happened were consensual, and she agreed that they were." Eckhaus Dep. 65:17–21, CE0230.

Notwithstanding the cease and desist letter, both Starost and Zerfas still were required to attend Thursday morning staff meetings held by Crowell. Crowell Dep. 31:14 – 32:9, CE0305–06. However, when Eckhaus noticed that Zerfas was "groaning and moaning" during a slide conference, he advised her that she did not have to attend slide conferences if she did not want to and he arranged for her to receive the same information outside of the conferences. Eckhaus Dep. 71:17 – 77:11, CE0236–42. According to Eckhaus, he did not tell Starost to stop attending the slide conference because it was "expected the pathologists attend," but only "elective for Pat [Zerfas] to attend" the slide conferences. *Id.* at 75:11–20, CE0240. Zerfas, however, concludes that Eckhaus was excluding her from attending. Zerfas also asserts that she was excluded from the department's quarterly lunches in July and October 2011 and January 2012, Zerfas Dep. Vol. II 275:6–9, CE0113, although Eckhaus has testified that she was not invited because she was out of the office on the dates of the July and October lunches, Eckhaus Dep. 89:20 – 91:3, CE0254–56, and pathologist Mark Bryant has stated that there was no lunch held in January 2012, Bryant Decl. ¶ 23, Def.'s Mem. Ex. 11, ECF No. 8-13, CE0685.

A Management Inquiry took place between May 25, 2011 and June 15, 2011 and was conducted by Susan Grimes Associates, Inc., an independent contractor. Management Inquiry 1, Def.'s Mem. Ex. 18, ECF No. 8-20, CE0752. The Management Inquiry concluded that both

Zerfas and Starost had participated in a number of physical and sexual interactions at work. *Id.* at 11–13, CE0762–64. After reviewing the inquiry, Crowell determined that Zerfas had not been sexually harassed by Starost, and that both she and Starost had participated in an extended course of inappropriate conduct in the workplace that constituted misconduct. *See* Crowell Dep. 19:14–17, 30:10–16, Def.'s Mem. Ex. 5, ECF No. 8-7, CE0293–304. Although Hollway recommended terminating both Zerfas and Starost, Holloway Dep. 53:18 – 54: 20, Def.'s Mem. Ex. 8, ECF No. 8-10, CE0630–61, Crowell proposed suspending Starost for twenty-eight days, Starost Proposal to Suspend, Def.'s Mem. Ex. 19, ECF No. 8-21, CE0879, and suspending Zerfas for twenty-one days, Zerfas Proposal to Suspend, Def.'s Mem. Ex. 20, ECF No. 8-22, CE0885. These suspensions were reduced to twenty-one and fourteen days, respectively, upon review by Charmaine Foltz. Zerfas Decision 2, Def.'s Mem. Ex. 21, ECF No. 8-23, CE0892; Starost Decision 2, Def.'s Mem. Ex. 22, ECF No. 8-24, CE0894.

Although the parties continue to disagree about many things regarding the interactions between Zerfas and Starost, whether he was her supervisor for purposes of a hostile workplace claim, and whether the actions taken by Defendant constitute an appropriate response to the facts revealed by the investigation, what is quite clear is that once the Defendant took disciplinary action against Starost and Zerfas, the conduct that forms the basis for this lawsuit ceased. The record is devoid of any evidence that, following the disciplinary actions taken, Starost continued to harass Zerfas, despite the fact that both continue to work at DRSB.

Defendant acknowledges that Zerfas properly pursued her administrative remedies, Def.'s Mem. 27, following which she filed her two-count Complaint in this Court on September 3, 2014, ECF No. 1, alleging claims for (I) sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and (II) retaliation in violation of Title

VII.   On November 10, 2014, Defendant filed a Motion to Dismiss or, in the Alternative, for Summary Judgment ("Def.'s Mot."), ECF No. 8, with a supporting Memorandum ("Def.'s Mem."), ECF No. 8-1.   Zerfas filed an opposition and cross-moved for summary judgment, Pl.'s Opp'n to Mot. for Summ. J. and Cross Mot. for Summ. J. ("Def.'s Cross-Mot."), ECF No. 9, with a supporting Memorandum ("Pl.'s Cross-Mot. Mem."), ECF No. 9-1.   Defendant filed a consolidated opposition and reply ("Def.'s Reply"), ECF No. 10, and Zerfas has filed a consolidated reply and proposed surreply ("Pl.'s Reply"), ECF No. 12, along with a Request for Leave to File Surreply to Defendant's Reply in Support of Defendant's Motion for Summary Judgment ("Pl.'s Mot. to File Surreply"), ECF No. 11.   Defendant has not responded to the Motion to File Surreply and the time to do so has passed.[3]   Loc. R. 105.2.   Accordingly, all of the pending motions are ripe and are before me.   Having reviewed the filings, I find a hearing is not required.   Loc. R. 105.6.

## II.   STANDARDS OF REVIEW

### A.  Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it fails to state a claim upon which relief can be granted."   *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012).   This rule's purpose "'is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'"   *Id.* (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)).   To that end, the Court bears in mind the requirements of Fed. R. Civ. P. 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009),

---

[3] As stated *infra* at 14, although Plaintiff styled her filing as a motion to file surreply, it properly is regarded as a reply, filed as a matter of right.   I therefore have accepted and considered it.

when considering a motion to dismiss pursuant to Rule 12(b)(6).  Specifically, a complaint must

contain "a short and plain statement of the claim showing that the pleader is entitled to relief,"

Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice,"

*Iqbal*, 556 U.S. at 678–79; *see Velencia*, 2012 WL 6562764, at *4 (discussing standard from

*Iqbal* and *Twombly*).  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 663.

When reviewing a motion to dismiss, "[t]he court may consider documents attached to

the complaint, as well as documents attached to the motion to dismiss, if they are integral to the

complaint and their authenticity is not disputed." *Sposato v. First Mariner Bank*, No. CCB-12-

1569, 2013 WL 1308582, at *2 (D. Md. March 28, 2013); *see CACI Int'l v. St. Paul Fire &

Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009); *see also* Fed. R. Civ. P. 10(c) ("A copy of a

written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

However, if the Court considers matters outside the pleadings, the Court must treat the motion as

a motion for summary judgment.  Fed. R. Civ. P. 12(d); *Syncrude Canada Ltd. v. Highland

Consulting Group, Inc.*, 916 F. Supp. 2d 620, 623 (D. Md. 2013).

"[A] district judge has 'complete discretion to determine whether or not to accept the

submission of any material beyond the pleadings that is offered in conjunction with a Rule

12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not

consider it." *Sager v. Hous. Comm'n*, 855 F. Supp. 2d 524, 542 (D. Md. 2012) (quoting 5C

Charles Alan Wright et al., *Federal Practice & Procedure* § 1633, at 159 (3d ed. 2004, 2011

Supp.))  "This discretion 'should be exercised with great caution and attention to the parties'

procedural rights.'  In general, courts are guided by whether consideration of extraneous material 'is likely to facilitate the disposition of the action,' and 'whether discovery prior to the utilization of the summary judgment procedure' is necessary."  *Id.*

Here, both Plaintiff and Defendant have sought summary judgment as an alternative procedural resolution to Defendant's motion to dismiss, and both have cited liberally to the very extensive agency record and comprehensive document and deposition discovery taken before the EEO Office.  Thus, the procedural posture of this case is such that there can be little doubt about the appropriateness of my considering the extensive evidence extrinsic to the pleadings.  Nor can this be characterized as a case where summary judgment should be put off until after discovery before this Court is conducted.

### B.  Summary Judgment

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts.  *See Celotex v. Catrett*, 477 U.S. 317, 325 (1986).  The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment.

*Id.* "[U]nder Fed. R. Civ. P. 56, as amended in 2010, facts in support of or opposition to a motion for summary judgment need not *be* in admissible form; the requirement is that the party identify facts that *could be* put in admissible form." *Mallik v. Sebelius*, 964 F. Supp. 2d 531, 546 (D. Md. Aug. 28, 2013) (citing *Niagara Transformer Corp. v. Baldwin Techs., Inc.*, No. DKC-11-3415, 2013 WL 2919705, at *1 n.1 (D. Md. June 12, 2013)).

## III.   DISCUSSION

### A.  Conversion to Summary Judgment

As already noted, the parties have appended extensive factual materials to support their arguments.  A description of what this consists of is helpful to appreciate why summary resolution is appropriate.  The record contains over over one thousand pages of exhibits, comprising depositions of Zerfas, Starost, and their supervisors taken during administrative proceedings; the materials considered by the original Management Inquiry; the results of that investigation; and records of the resulting disciplinary actions taken against Zerfas and Starost. Although it is possible that there is information in existence that has not yet been produced, it strikes me as extremely unlikely that further discovery would add meaningfully to the parties' ability to present factual support for their positions.  Nor has any party indicated that more discovery is necessary in order to respond to a motion for summary judgment under Fed. R. Civ. P. 56(d).  This case is one in which conversion is appropriate even at this early stage.

When the Court converts a motion to dismiss under Rule 12 to one for summary judgment under Rule 56, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  Notably, "the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion."  *Ridgell v. Astrue*, DKC-10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012).

Thus, this requirement "can be satisfied when a party is 'aware that material outside the pleadings is before the court.'" *Walker v. Univ. of Md. Med. Sys. Corp.*, No. CCB-12-3151, 2013 WL 2370442, at *3 (D. Md. May 30, 2013) (quoting *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985)). Indeed, though the Court "clearly has an obligation to notify parties regarding any court-instituted changes in the pending proceedings, [it] does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). It is obvious that the Court may construe a motion that is styled as a "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment," as a motion for summary judgment. *Ridgell*, 2012 WL 707008, at *7; *see Laughlin*, 149 F.2d at 260–61. Here, not only has Defendant so styled its motion, but Zerfas has responded with a cross-motion for summary judgment, indicating that she knows what is at stake. Moreover, the parties themselves have cited liberally to the extensive record to support their arguments, which further indicates their awareness of (and acquiescence in) its consideration by the Court. Accordingly, I will consider the parties motions as motions for summary judgment.

### B. Motion to File Surreply

Local Rule 105.2(a) provides that "[u]nless otherwise ordered by the court, surreply briefs are not permitted to be filed." However, when parties have cross-moved for summary judgment, the second movant is entitled to the last word. *See* Loc. R. 105.2(c). Likely because both parties' motions have focused on essentially the same issues, I can see nothing in Zerfas's proposed surreply that is not appropriate for her to address in a reply that she may file as a matter of right. Accordingly, although Plaintiff's caution is commendable, there is no need for her to seek leave and her Motion to File Surreply is moot; I will accept and consider Plaintiff's Reply as a properly filed reply as of right.

### C. Summary Judgment

*1. Count I: Sexual Harassment/Hostile Work Environment*

Count I of the Complaint alleges that Starost's sexual harassment created a hostile work environment in violation of Title VII. Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). To be actionable under 42 U.S.C. § 2000e-2(a)(1), discrimination need not be "economic" or "tangible." *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21 (1993) (citations and quotation marks omitted). Rather, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986) (internal brackets and quotation marks omitted)).

A claim for hostile work environment based on sex is actionable under Title VII if the plaintiff shows that "'the offending conduct (1) was unwelcome, (2) was because of her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and (4) was imputable to her employer.'" *Westmoreland v. Prince George's Cnty., Md.*, 876 F. Supp. 2d 594, 614 (D. Md. 2012) (quoting *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011) (internal citation and quotation marks omitted)). "In a case where an employee is sexually harassed by a co-worker, the employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it." *Hoyle*, 650 F.3d at 335 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998)).

Based upon the record before me, it appears likely (though I need not expressly find) that a jury could find in favor of Zerfas on the first three elements.  Zerfas has provided extensive evidence to show that Starost's conduct was unwelcome.  *See generally* Zerfas ROI Aff., CE0651–80; *see also* Zerfas Dep. Vol. II 287:3–19, CE0116.  It readily is apparent that the sexual contact between her and Starost was because of her sex.  And the requests that Zerfas expose her breasts and genitals to Starost, combined with the physical contact—which included touching Zerfas's breasts, buttocks, and genitals; having her touch Starost's genitals; and, according to Zerfas, physically trapping her in her office—goes far beyond "'simple teasing,' offhand comments, and isolated incidents" and is certainly severe and pervasive enough to create an abusive working environment.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted).

However, the central question is whether the facts demonstrate that any harassment that Zerfas suffered was imputable to her employer.  "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 809 (1998).  "If the harassing employee is the victim's co-worker, [rather than a supervisor,] the employer is liable only if it was negligent in controlling working conditions."  *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).  In *Vance v. Ball State University*, the Supreme Court clarified that a harasser may be considered a supervisor "only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits.'"  *Vance*, 133 S. Ct. at 2443 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Zerfas, relying primarily on pre-*Vance* case law, contends that Starost was her supervisor for several reasons.  First, she argues that he oversaw her work, he frequently gave her work assignments, he sometimes served as acting chief in Eckhaus's absence, and she perceived him to be her supervisor.  *See* Pl.'s Cross-Mot. Mem. 6–8.  However, in the wake of *Vance*, it is clear that the mere fact that Starost "ha[d] the ability to direct [Zerfas's] labor to some ill-defined degree" is not a sufficient basis to impose vicarious liability on their employer.  *Vance*, 133 S. Ct. at 2443.  Rather, I must focus only on his authority to take tangible employment actions against her.[4]

---

[4] Zerfas relies on *Barcus v. Sears, Roebuck and Co.*, No. CCB-12-724, 2013 WL 4591235 (D. Md. Aug. 28, 2013), for the proposition that her subjective belief that Starost was her supervisor is a sufficient basis to hold Defendant vicariously liable for his harassment even if she was mistaken.  This reliance is misplaced.  In *Barcus*, the Court's decision did not turn on whether the harasser was a supervisor under a post-*Vance* analysis, and the Court granted summary judgment for the defendant on other grounds.  All that *Barcus* stands for in the context of this case is that *Vance* does not supersede dicta in *Ellerth* that, in unusual cases, an employer still may be liable for harassment by a non-supervisor where the victim was under the reasonable, but erroneous, belief that the harasser was a supervisor.  *See id.* at *6 (citing *Ellerth*, 524 U.S. at 759; *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 n.7 (4th Cir. 2012)).  Judge Blake assumed this to be the case in *Barcus* because the harasser was in a general-manager trainee program designed to give actual management experience to future general managers, he sometimes filled in for the general manager at the plaintiff's store in her absence, the harasser told the plaintiff that he soon would be general manager of his own store and that he would hire her when he got his position, and he gave her information about how to request transfer to his store so that she could do so.  *See id.* at *1–2, 6.  Under these unusual facts, it is possible that the plaintiff reasonably could have believed that the harasser was her supervisor.  In this case, however, Starost was not in a management-trainee position, never made representations to Zerfas that he was or would be her supervisor, and never promised that if she yielded to his demands he would take favorable employment action on her behalf of a type that only a supervisor could promise.  Thus, on the record before me, if Zerfas thought that Starost was her supervisor, that assumption was neither reasonable nor accurate, and any dicta in *Ellerth* allowing an employer to be held vicariously liable for harassment of a non-supervisor if the victim reasonably believed he was a supervisor simply is unavailing.

Zerfas also argues that Starost hired her, had the authority to fire her, and was empowered to change her responsibilities and benefits, *see* Pls.' Cross-Mot. Mem. 7–8, but the evidence presented by both parties shows otherwise. To establish that he had hiring authority, Zerfas points to the fact that Starost participated in her interview and selection process and recommended that she be hired because she "was the best candidate." *Id.* at 8; Starost Dep. 27:5 – 28:2, CE0379–80. However, the record makes clear that Eckhaus, not Starost, made the decision to hire Zerfas. *Id.* (Starost merely provided a recommendation to Eckhaus). Zerfas argues that this is sufficient because a supervisor "need not have the final say as to the tangible employment action; instead, the employee's decision may be 'subject to approval by higher management.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (en banc) (quoting *Vance*, 133 S. Ct. at 2446 n.8). But Zerfas has not put forward any evidence to show that Starost was empowered to make the hiring decision in the first instance—recommending that someone be hired is not the same as exercising the authority to offer the job to an applicant (even if a higher supervisor must approve that offer).[5] Similarly, although Zerfas cites four instances in which Starost supposedly "had the power to terminate" employees, in each case, Starost merely gave negative feedback to Eckhaus, and it was Eckhaus who made the decision to terminate or reassign the employee. Zerfas Decl. ¶ 25. And regardless, assuming that Starost did have the authority to terminate some employees, Zerfas has provided no basis for finding that he had the power to terminate *her*, which is the only relevant consideration. *See Vance*, 133 S. Ct. 2439 (employee is a supervisor if empowered "to take tangible employment

---

[5] Even were I to credit Zerfas's claim that Starost played a key role in hiring summer students and other individuals, *see* Pl.'s Cross-Mot. Mem. 8, that shows only that he may have been the supervisor of those other individuals and is not relevant to his status with respect to Zerfas.

actions *against the victim*" (emphasis added)).[6]  Zerfas's inability to show that Starost had hiring

or firing power over her particularly is noteworthy in the government sector, where executive

agencies typically have clearly delineated chains of command with the repositories of such

authority well-documented.   *Cf. id.* at 2443 ("supervisory status can usually be readily

determined, generally by written documentation").   Absent from the voluminous record is any

document that describes Starost's job as including the authority to hire or fire any employee, let

alone Zerfas, and this absence itself is evidence that it did not.  *See* Fed. R. Evid 803(7) & (10).

Zerfas also tries to show that Starost had the authority to affect her responsibilities or

benefits, but both of the examples she cites demonstrate that Eckhaus, not Starost, possessed this

authority.  Pl.'s Cross-Mot. Mem. 7–8.  First, in 2006, Zerfas had issues regarding a project of

Starost's and he threatened to take her off of the project.  Zerfas Decl. ¶ 21.  However, to do so,

he had to go to Eckhaus to request that she be removed, and the end result appears to have been

closer supervision of Zerfas by Eckhaus, not her removal from the project as sought by Starost.

*Id.*  Similarly, during the course of the alleged sexual harassment, Starost sought to prevent

Zerfas from publishing scholarly papers (which could burnish Zerfas's professional credentials

and heighten her opportunity for promotion).   Zerfas Dep. Vol. II 431:12–20, CE0152.

However, once again Starost had to bring his concerns to Eckhaus, who declined to prohibit

Zerfas from publishing.  *Id.* at 431:21 – 432:7, CE0152.  In short, Starost may have been free

with his opinions of his coworkers and he may have had Eckhaus's ear on some occasions, but

he was not Zerfas's supervisor under the clear criteria established by *Vance.*

---

[6] These instances of supposed firing authority also lack any information about Zerfas's basis of
knowledge regarding personnel decisions affecting others.  Because this information appears to
be based on hearsay, it is not clear that it could be put in admissible form and, thus, that it can be
considered on summary judgment regardless of its relevance.  *See Mallik v. Sebelius*, 964 F.
Supp. 2d 531, 546 (D. Md. 2013).

This case is distinguishable from *Basil v. Maryland Transportation Authority*, No. RDB-12-0556, 2014 WL 1622321 (D. Md. Apr. 23, 2014), where a reasonable jury could have found a police officer's harasser had been "'effectively delegated decision making authority.'" *Id.* at *9. *Basil* involved specific evidence that the officer that ultimately discharged the plaintiff considered the harasser to be like a son and saw himself as the harasser's mentor, *id.* at *1, which allowed for the conclusion that his decision was based primarily on his relationship with the harasser, *id.* at *9. In contrast, although Zerfas may have believed that Starost had favored status with Eckhaus, she has not provided more than a "scintilla" of evidence on this issue and, rather, the uncontroverted evidence shows that Eckhaus held all decision-making authority and frequently did not accept Starost's recommendations. To find that Starost was a supervisor would require me to hold that any employee whose input is respected and considered by management is a supervisor, thus eviscerating the Supreme Court's holding in *Vance*.

In the alternative, Zerfas argues that Defendant is liable under a negligence theory, *see* Pl.'s Cross-Mot. Mem. 42, under which an employer may be liable if it "knew or should have known of the offensive conduct but failed to take appropriate corrective action." *Vance*, 133 S. Ct. at 2456. Zerfas has provided nothing but conjecture and surmise that her supervisors were aware of the harassment. She acknowledges that she not did report it until May 23, 2011, and the record is unambiguously clear that, once reported, no further harassment occurred. Eckhaus Dep. 25:21 – 26:21, CE0190–91. And although she claims that Eckhaus should have known, this view is based only on inadmissible speculation: according to Zerfas, Eckhaus's office was adjacent to Starost's and had thin walls with gaps in them, and therefore (Zerfas believes) Eckhaus must have heard Starost's inappropriate comments. *See* Zerfas Dep. Vol. II 446:20 – 448:12, CE0155–56. But Zerfas has produced no evidence that Eckhaus even was in his office

when inappropriate comments were being made, much less that he overheard comments frequent and explicit enough to put him on notice that sexual harassment was occurring.  Zerfas also claims that Eckhaus should have surmised that Starost was harassing her because on one occasion he pointed a laser pointer at Zerfas's breasts in Eckhaus's presence.  *Id.*  But even assuming (without any evidentiary support) that Eckhaus saw this, a single incident of pointing a laser pointer at a co-worker's breasts falls within the category of "'simple teasing, offhand comments, and isolated incidents'" that is unlikely to have put him on notice of a possible hostile work environment in any event.  *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)).  Finally, the very speed with which Eckhaus acted once Zerfas reported Starost's harassment and the extent of the action taken to prevent him from further abusive contact with her belies the notion that he had prior knowledge of the harassment.

Defendant also falls within the so-called *Ellerth/Faragher* defense, which protects an employer where "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) [] the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided."  *Boyer-Liberto*, 786 F.3d at 278 (citing *Vance*, 133 S. Ct. at 2453; *id.* at 2464 (Ginsburg, J., dissenting)).  This, "in essence, imposes a duty on the victim to report her supervisor's harassing behavior to the employer."  *Id.*  Because Zerfas did not report the alleged harassment until May 23, 2011 (eleven months after it commenced), Pl.'s Resps. to Def.'s Reqs. for Admissions 1, Def.'s Mem. Ex. 26, ECF No. 8-28, CE0946, she unquestionably fails to satisfy the second prong of the *Ellerth/Faragher* inquiry.

Zerfas also cannot avoid the first prong of the inquiry.  "Distribution of an anti-harassment policy provides 'compelling proof' that the company exercised reasonable care in

preventing and promptly correcting sexual harassment." *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 232, 267 (4th Cir. 2001). Zerfas argues that the existence of an anti-sexual harassment policy was insufficient here because "all of the responding management officials, from Ms. Holloway, Dr. Foltz, Dr. Crowell, Dr. Eckhaus, and Dr. Starost, had outdated POSH [prevention of sexual harassment] training." Pl.'s Cross-Mot. Mem. 44. Zerfas also tries to make much of the inability of several supervisors to explain the legal distinction between "nonconsensual" and "unwelcome" sexual conduct. *Id.* But these issues simply are beside the point in light of *Barrett*—particularly where Zerfas does not dispute that all of the involved supervisors actually did receive sexual harassment training and they all promptly responded once she did report harassment. However imperfect Zerfas believes Defendant's anti-sexual harassment policy was (and the law does not require it to be perfect), it existed, and once Zerfas belatedly reported the harassment, it was deployed promptly and effectively. Title VII does not require more.

Zerfas correctly notes that mere distribution of a policy is insufficient where a plaintiff can show that it was administered "'in bad faith or that the policy was otherwise defective or dysfunctional,'" *Barrett*, 240 F.3d at 266, but that typically requires a fundamental failure or refusal to enforce a policy, *see, e.g.*, *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 299–300 (4th Cir. 2004) (management did not exercise reasonable care where it disregarded complaints); *Miles v. DaVita Rx, LLC*, 962 F. Supp. 2d 825, 832–33 (D. Md. 2013) (defendant's employees did not seriously investigate complaints of sexual harassment). There is no evidence of such failures here, notwithstanding Zerfas's arguments to the contrary. Zerfas argues that Eckhaus disregarded earlier sexual harassment complaints against Starost in 2005, Pl.'s Reply 5, but the uncontroverted evidence shows that the incident in question did not involve sexual harassment,

but rather involved consensual conduct, *see, e.g.*, Eckhaus Dep. 18:14 – 20:8, CE0183–185.[7]

The same day that Eckhaus learned of the allegations of Starost's harassment, he reported it up

the chain of command even though Zerfas herself had not intended to report it through official

channels, *id.* at 27:15 – 30:11, CE0192–95, and a thorough investigation was made by an

independent company. *See* Management Inquiry 1, CE0752.

There is little question that, were a jury to credit Zerfas's version of events, it could find

that she was subjected to severe and pervasive sexual harassment that rendered her workplace

hostile. But because on the extensive record before me no reasonable jury could find that Starost

was Zerfas's supervisor with the authority to take a tangible employment action or that anybody

in Zerfas's supervisory chain was aware of the harassment and failed to act to stop or prevent it,

she cannot satisfy the elements of a *prima facie* hostile work environment claim and Defendant

is entitled to summary judgment on Count I.

---

[7] Zerfas also relies on two instances when NIH management supposedly was unresponsive to her claims of harassment or discrimination. In one of these instances, her supervisor in the National Institutes of Neurological Disease and Stroke in 2001 ignored complaints that another employee was trapping her in a room, attempting to cut her hair, and throwing crabapples at her face. Zerfas Dep. 43:4–15, CE0011. However unpleasant this must have been, it cannot show that Eckhaus, Crowell, or Foltz were failing to fulfill their own responsibilities a decade later. She also focuses on a past instance in which she had a serious dispute with another coworker that involved the coworker continuing to wear latex gloves notwithstanding Zerfas's latex allergy and, on one occasion, physically threatening Zerfas. Zerfas Dep. Vol. II 400:5 – 401:13, CE0144. According to Zerfas, her supervisors concluded that she was the instigator in that dispute and Eckhaus tried to get her to go into employee counseling (which she refused) and said that he no longer wanted to be her supervisor. *Id.* at 407:1 – 408:14, CE0146. But this does not show that Eckhaus was nonresponsive to claims of discrimination or sexual harassment, an argument that is belied by his quick response when Zerfas reported what had been occurring between her and Starost. Zerfas also argues that NIH was unresponsive because after she approached Gary Moore, Facility Operations Specialist Supervisor, Real Property/Facilities Management Branch, DVM for help, he "had an obligation to report the harassment but did not." Pl.'s Cross-Mot. Mem. 14. This grossly mischaracterizes Zerfas's own testimony, according to which Moore told Zerfas that he would have to report the harassment and did not do so immediately only after she promised that she would report it herself. Zerfas Dep. 78:6–17, CE0020.

2. *Count II: Retaliation*

Zerfas also alleges that she was retaliated against after she reported Starost's harassment because she was suspended for fourteen days, was told she did not have to attend slide conferences, was required to continue attending meetings with Starost, and was excluded from quarterly lunches.  Title 42 United States Code § 2000e-3(a) provides that it is unlawful for an employer "to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  Although "[t]he plain meaning of the statutory language provides protection of an employee's opposition activity when the employee responds to an actual unlawful employment practice," the Fourth Circuit has "[r]ead[] the language generously to give effect to its purpose" and "held that opposition activity is protected when it responds to an employment practice that the employee *reasonably believes* is unlawful."  *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006), *overruled by Boyer-Liberto*, 786 F.3d 264 (4th Cir. 2015) (en banc).

To succeed on a Title VII retaliation claim, a plaintiff must show that (1) she "'engaged in protected activity,'" (2) the employer "'took adverse action against [her],'" and (3) "'a causal relationship existed between the protected activity and the adverse employment activity.'" *Westmoreland*, 876 F. Supp. 2d at 612 (quoting *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (alterations in original)).  In the Fourth Circuit, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973), applies to Title VII retaliation claims.  *IJames v. Autumn Corp.*, No. 1:08CV777, 2009 WL 2171252, at *8 (M.D.N.C. July 20, 2009); *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006).  Under this framework, after an employee makes out a *prima facie* case, the burden shifts

to the employer, which then must "proffer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Wright v. Sw. Airlines*, 319 Fed. App'x 232, 233 (4th Cir. 2009). If the employer does so, the burden shifts back to the employee "to prove by a preponderance of the evidence that the proffered reasons were pretextual." *Id.* at 233.

First, Zerfas has not cited to any case law that shows that requiring her to continue to attend staff meetings (as she had done before she reported the harassment) was a form of retaliation. To the contrary, this is a lack of any employment action and cannot be seen as adverse action. Similarly, Eckhaus did not exclude her from slide conferences and journal club; rather, although she was not a required attendee at those meetings, he facilitated her preference to not attend those meetings with Starost by arranging for her to get the information separately. Zerfas Dep. Vol. II 282:19 – 284:20, CE0114–15; Eckhaus Oct. Aff. 12, CE0701 .

And assuming, without deciding, that Zerfas has made out a *prima facie* case with respect to the rest of the alleged adverse actions, Defendant has shown that it had a legitimate, non-discriminatory reason for all of them. First, Crowell has testified that no morning staff meetings occurred during the time that Zerfas alleges she was excluded from those meetings. Crowell Dep. 32:10 – 33:6, CE0306–07. It cannot be an act of retaliation to not invite an employee to a meeting that did not take place, and Zerfas has not provided any evidence to show that meetings did take place during that time. Similarly, Defendant has proffered evidence that the hosts of the July and October 2011 lunches believed that Zerfas was out of the office at the time of those two lunches, Eckhaus Dep. 89:20 –91:3, CE0254–56; Bryant Decl. ¶¶ 16–18, Def.'s Mem. Ex. 11, ECF No. 8-13, CE0684–85; Brinster Decl. ¶ 14, Def.'s Mem. Ex. 12, ECF No. 8-14, CE0668, and no lunch was held in January 2012, Bryant Decl. ¶ 23, CE0685. Zerfas has not rebutted

these statements and they provide a legitimate, nondiscriminatory reason why she was not invited to lunches that did not occur or that she could not have attended.

With respect to Zerfas's suspension, the picture is somewhat more complicated, but here as well, Defendant has put forward a legitimate, nondiscriminatory reason for its action: management concluded—after a lengthy investigation culminating in a 277-page report, ROI, Pl.'s Cross-Mot. Mem. Ex. 1, ECF No. 9-2—that Zerfas was a consensual participant in multiple instances of inappropriate sexual behavior in the workplace. *See* Management Inquiry 11–12, Def.'s Mem. Ex. 18, ECF No. 8-20, CE0762–64; Zerfas Proposal to Suspend, Def.'s Mem. Ex. 20, ECF No. 8-22, CE0885–90. Zerfas disagrees with this conclusion, *see* Pl.'s Reply 6–7, but Title VII does not permit courts to "'sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination.'" *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)). To the contrary, "'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for'" the adverse employment action. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (quoting *DeJarnette*, 133 F.3d at 299). However strong her objections to her supervisors' conclusions, Zerfas has not introduced any evidence to show that those conclusions were not reached in good faith.

Zerfas does not deny any of the specific charges in her Proposal to Suspend and, to the contrary, acknowledges that each of those acts took place. Instead, she focuses on one interaction with Eckhaus on May 24, 2011—the day after Zerfas first reported that she was being sexually harassed—when he "told her that [he] had a sense that aspects of what happened were consensual, and she agreed that they were." Eckhaus Dep. 65:17–21, CE0230. Zerfas compares

this to *Butler v. Md. Aviation Admin.*, No. MJG-11-2854, 2012 WL 3541985 (D. Md. Aug. 14, 2012), in which an employer "allegedly took a 'blame the victim' attitude and exhibited 'hostility' toward" the plaintiff by allowing the investigation of her complaint to turn into an opportunity to solicit grievances and accusations against her from her coworkers. *Id.* at *2.  But that case stands apart from the one undoubtedly relevant question asked by Eckhaus, with which Zerfas "readily agreed."  Eckhaus Dep. 68:16, CE0233.  Nor was Eckhaus's question completely without basis: when Zerfas first went to Eckhaus, she *volunteered* that she "felt like [she] consented with [Starost] on some of the behaviors."  Zerfas Dep. Vol. II 390:11–19, CE0141.  And even if a jury could find that this demonstrated that Eckhaus was biased, Zerfas has provided no indication that he played any part in the management inquiry, which was conducted by an outside contractor under the supervision of Crowell (Eckhaus's supervisor), who pointedly did not discuss the investigation with Eckhaus while it was in progress.  *See* Management Inquiry 1, CE0752; *see also* Crowell Dep. 18:14–21, CE0292.

Finally, Zerfas attempts to argue that the *McDonnell Douglas* framework is not decisive here because she can proceed on a "direct evidence" theory.  *See* Pl.'s Cross-Mot. Mem. 47; Pl.'s Reply 6–7.  It is true that where a plaintiff can present direct evidence of discrimination or retaliation, the burden-shifting framework of *McDonnell Douglas* does not apply.  *E.E.O.C. v. Greystar Mgmt. Servs. L.P.*, No. ELH-11-2789, 2013 WL 6731885, *11–13 (D. Md. Dec. 18, 2013).  However, the supposed "direct evidence" of a retaliatory motive is the fact that the management "investigation was launched in response to a complaint by Patricia Zerfas regarding Dr. Matthew Starost."  Management Inquiry 1, CE0752.  This does not amount to "'conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision,'" *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir.

2006) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc)), and nothing here directly indicates hostility towards her for reporting sexual harassment.  At the most, the Management Inquiry noted the undisputably true fact that management first became aware of the contact between Starost and Zerfas—irrespective of whether it was consensual— when Zerfas reported it to Eckhaus.  This does not say anything about the employer's motives in the resulting investigation or undermine its legitimate, nondiscriminatory reason for suspending Zerfas (as well as Starost.  The fact that the investigation Defendants were required to take in response to Zerfas's complaint of harassment revealed evidence (some of which was provided by Zerfas herself) leading her supervisors to conclude that at least some of the sexual conduct was consensual but nonetheless legitimately proscribed workplace conduct does not amount to "direct evidence" of retaliatory intent.

The record before me is far from clear as to whether Zerfas was subjected to unwelcome and harassing conduct or was, at times, a willing (if, perhaps, reluctant) participant in an inappropriate workplace sexual relationship.  And were that the relevant question before me, it is likely that the evidence put forward by Zerfas would be sufficient to entitle her to a jury trial. But based on the lengthy ROI and Management Inquiry and the uncontroverted evidence that, rightly or wrongly, NIH management believed in good faith that Zerfas consensually had engaged in improper behavior in the workplace, no reasonable jury could find that she was the victim of retaliation for having reported the harassment she alleges.  Accordingly, Defendant is entitled to summary judgment on Count II as well.

**IV.      CONCLUSION**

Accordingly, Defendant's Motion to Dismiss or, in the Alternative for Summary Judgment, construed as a motion for summary judgment, will be GRANTED and Plaintiff's Cross-Motion for Summary Judgment will be DENIED.

Plaintiff's Motion to File Surreply will be DENIED as moot and the purported surreply construed as a properly filed reply permitted as of right.

A separate order shall issue.

Dated: <u>June 26, 2015</u>                                    _____/S/_____
                                                                          Paul W. Grimm
                                                                          United States District Judge
dsy